UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-2334 JGB (SHKx)** | Date | April 6, 2023 |
|---|---|---|---|
| Title | ***Brian Mattison v. Loma Linda University Medical Center, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING Plaintiff's Partial Motion for Summary Judgment (Dkt. No. 60); (2) GRANTING Defendant Loma Linda University Medical Center's Motion for Summary Judgment (Dkt. No. 57); (3) GRANTING-IN-PART AND DENYING-IN-PART Defendant Loma Linda University Shared Services' Motion for Summary Judgment (Dkt. No. 58); and (4) VACATING the April 10, 2023 Hearing (IN CHAMBERS)**

Before the Court are Plaintiff Brian Mattison's ("Mattison" or "Plaintiff") partial motion for summary judgment ("PMSJ," Dkt. No. 60); Defendant Loma Linda University Medical Center's ("UMC") motion for summary judgment ("UMC MSJ," Dkt. No. 57); and Defendant Loma Linda University Shared Services' ("USS") motion for summary judgment ("USS MSJ," Dkt. No. 58) (collectively, "Motions"). The Court determines the Motions are appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court **DENIES** the PMSJ, **GRANTS** the UMC MSJ, and **GRANTS-IN-PART AND DENIES-IN-PART** the USS MSJ. The April 10, 2023 hearing is **VACATED**.

## I.    BACKGROUND

On November 9, 2020, Plaintiff initiated this action against UMC. ("Complaint," Dkt. No. 1.) On March 15, 2021, Plaintiff filed a first amended complaint with leave from the Court. ("FAC," Dkt. No. 26.) On August 30, 2021, Plaintiff filed a second amended complaint with leave from the Court and added USS as a defendant. ("SAC," Dkt. No. 37.) The SAC alleges the following eight causes of action: (1) violation of the Family and Medical Leave Act

("FMLA") ("Claim One"); (2) violation of the California Family Rights Act ("CFRA") ("Claim Two"); (3) disability/perceived disability discrimination under the Americans with Disabilities Act Amendments Act ("ADAAA") ("Claim Three"); (4) discrimination under the California Fair Employment and Housing Act ("FEHA") ("Claim Four"); (5) retaliation under the ADAAA ("Claim Five"); (6) retaliation under the FEHA ("Claim Six"); (7) hostile work environment under the ADAAA ("Claim Seven"); and (8) hostile work environment under FEHA ("Claim Eight").  (See SAC.)  On September 13, 2021, UMC answered the SAC. ("UMC Answer," Dkt. No. 39.)  On October 22, 2021, USS answered the SAC  ("USS Answer," Dkt. No. 48.)

On August 1, 2022, UMC filed the UMC MSJ.  (See UMC MSJ.)  In support, UMC filed the following documents:

- Statement of Undisputed Facts ("UMC SUF," Dkt. No. 57-2);
- Declaration of Marc Hepps ("Hepps Declaration," Dkt. No. 57-3) with attached exhibits;
- Declaration of Suzette Adams ("Adams Declaration 1," Dkt. No. 57-4); and
- Request for Judicial Notice ("UMC RJN 1," Dkt. No. 57-5).

On August 8, 2022, Plaintiff opposed the UMC MSJ.  ("UMC MSJ Opposition," Dkt. No. 63.)  In support, Plaintiff filed the following documents:

- Plaintiff's Response to UMC SUF ("Pl.'s Response to UMC SUF," Dkt. No. 63-1); and
- Declaration of Monica Fermaint ("Fermaint Declaration 1," Dkt. No. 63-2) with attached exhibits.

On August 15, 2022, UMC replied.  ("UMC Reply," Dkt. No. 65.)  In support, UMC filed the following documents:

- UMC's Response to Pl.'s Response to UMC SUF ("UMC's Response to Pl.'s Response to UMC SUF," Dkt. No. 65-1);
- Evidentiary Objections to the PMSJ Opposition ("PMSJ Opp'n Evid. Objections," Dkt. No. 65-2); and
- Request for Judicial Notice ("UMC RJN 2," Dkt. No. 65-3) with attached exhibits.

On August 1, 2022, USS filed the USS MSJ.  (See USS MSJ.)  In support, USS filed the following documents:

- Statement of Undisputed Facts ("USS SUF," Dkt. No. 58-2);
- Declaration of Merna R. Abdelmalak ("Abdelmalak Declaration 1," Dkt. No. 58-3) with attached exhibits; and
- Declaration of Suzette Adams ("Adams Declaration 2," Dkt. No. 58-4).

On August 8, 2022, Plaintiff opposed the USS MSJ.  ("USS MSJ Opposition," Dkt. No. 62.)  In support, Plaintiff filed the following documents:

- Plaintiff's Response to USS SUF ("Pl.'s Response to USS SUF," Dkt. No. 62-1);
- Plaintiff's Statement of Undisputed Facts ("PSUF to USS MSJ," Dkt. No. 62-2); and
- Declaration of Monica Fermaint ("Fermaint Declaration 2," Dkt. No. 62-3) with attached exhibits.

On August 15, 2022, USS replied.  ("USS Reply," Dkt. No. 64.)  In support, USS filed the following documents:

- USS's Response to PSUF ("USS's Response to PSUF," Dkt. No. 64-1);
- Evidentiary Objections to Plaintiff's Opposition to USS MSJ ("Evid. Objections to Pl.'s Opp'n to USS MSJ," Dkt. No. 64-2); and
- Declaration of Merna R. Abdelmalak ("Abdelmalak Declaration 2," Dkt. No. 64-3).

On August 2, 2022, Plaintiff filed the PMSJ.[1]  (See PMSJ.)  In support, Plaintiff filed the following documents:

- Plaintiff's Statement of Undisputed Facts ("PMSJ PSUF," Dkt. No. 60-2); and
- Declaration of Moniac Fermaint ("Fermaint Declaration 3," Dkt. No. 60-3) with attached exhibits.

On August 8, 2022, UMC and USS (collectively, "Defendants") opposed the PMSJ.  ("PMSJ Opposition," Dkt. No. 61.)  In support, the Defendants filed the following documents:

- Defendants' Statement of Undisputed Facts ("DSUF," Dkt. No. 61-1);
- Defendants' Response to PMSJ PSUF ("Response to PMSJ PSUF," Dkt. No. 61-1);
- Objections to Plaintiff's Documentary Evidence ("Evid. Objections to PMSJ," Dkt. No. 61-2);
- Declaration of Suzette Adams ("Adams Declaration 3," Dkt. No. 61-3);
- Declaration of Merna R. Abdelmalak ("Abdelmalak Declaration 3," Dkt. No. 61-4) with attached exhibits.

On August 15, 2022, Plaintiff replied.  ("PMSJ Reply," Dkt. No. 66.)  In support, Plaintiff filed the following documents:

---

[1] The Court's Scheduling Order set the dispositive motion hearing cut-off deadline for August 29, 2022.  ("Scheduling Order," Dkt. No. 40.)  Defendants are correct that Plaintiff's PMSJ is untimely because it was filed on August 2, 2022, one day after dispositive motions should have been filed.  (PMSJ Opp'n at 1; see Scheduling Order.)  However, on August 1, 2022, Plaintiff submitted a motion for an extension of 24 hours to file its PMSJ.  (Dkt. No. 56.)  Given that Plaintiff's counsel asserted his firm was undergoing network issues at the time and that the extension was only for 24 hours, the Court considers and rules on the PMSJ.

**CIVIL MINUTES—GENERAL**

- Objections to Defendants' Statement of Facts ("Objections to Defs.' Opp'n," Dkt. No. 66-1).

## II.   EVIDENTIARY ISSUES

### A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers the parties' objections only where necessary.[2] All other objections are **OVERRULED AS MOOT**.

Defendants' hearsay objections are likewise **OVERRULED**. (See PMSJ Opp'n Evid. Objections; Evid. Objections to Pl.'s Opp'n to USS MSJ; Evid. Objections to PMSJ.) Declarations and deposition testimony which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial. Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004); see Orr, 285 F.3d at 779 n.27. Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004). At this stage, the Court does not find Defendants' hearsay objections to preclude the evidence submitted.

### B. Requests for Judicial Notice

UMC requests that the Court take judicial notice of the articles of incorporation for UMC, USS, Loma Linda University Health, Loma Linda University Health Care, and UMC's amendment to its articles of incorporation. (See UMC RJN 1 and UMC RJN 2.) The Court "may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Courts regularly take judicial notice of certificates of incorporation. See, e.g., Grant v. Aurora Loan Servs., Inc., 736 F. Supp. 2d 1257, 1265 (C.D. Cal. 2010) (taking judicial

---

[2] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form. Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

notice of the Delaware Secretary of State certification of incorporation for a corporation). Accordingly, the Court **GRANTS** UMC's RJN 1 and RJN 2.

## III.   FACTS

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motion.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

## A.  Plaintiff's Employment

On January 5, 2012, Plaintiff was hired as a Project Principal Trainer for Loma Linda University Health Care ("UHC"), which was controlled by UMC.  (UMC SUF ¶ 1.)  On December 20, 2015, he was transitioned from UHC to USS and he maintained his position as a Project Principal Trainer.  (Id. ¶ 2.)  When asked which entity employed him prior to USS, Plaintiff testified that he believes it was UMC.  (Pl.'s Response to UMC SUF ¶ 3.)  When asked about the transition from UMC to USS, Plaintiff testified that "the entities changed . . . I didn't change where I worked . . ."  (Pl.'s Response to UMC SUF ¶ 3.)

After the 2015 transition, Plaintiff's performance evaluations have the USS logo and state that the facility name of his evaluator is USS.  (UMC SUF ¶ 10.)  After the 2015 transition, some of Plaintiff's paychecks are from "Loma Linda University Health Services," and other paychecks are from USS.  (UMC SUF ¶ 12; Pl.'s Response to UMC SUF ¶ 10.)  Plaintiff's timecard reports state "Loma Linda University Health Care."  (Pl.'s Response to UMC SUF ¶ 10.)  The email correspondence signatures of Plaintiff, his direct supervisor, Bryan Solis ("Solis"), and Solis's supervisor, Beth Cook ("Cook"), state "Loma Linda University Health."  (Pl.'s Response to UMC SUF ¶ 10.)

Suzette Adams ("Adams"), Director of Employee Relations at USS, has a team that provides human resources support to employees.  (Pl.'s Response to UMC SUF ¶ 6.)  Her team provides support to a total of 17,000 employees and about 2,200 of those employees are in USS.  (Id.)  Adams's email signature states "Loma Linda Shared Services."  (Id. ¶ 10.)

On January 15, 2017, Plaintiff changed positions to an IT Instructional Designer at USS.  (UMC SUF ¶ 4.)  On November 5, 2017, Plaintiff changed positions to an IS Architect 2 at USS.  (Id. ¶  5.)  As part of his position as an IS Architect 2, Plaintiff serviced various Loma Linda entities and occasionally non-Loma Linda entities.  (Pl.'s Response to UMC SUF ¶ 8.)  He would often go to UMC to provide support or trainings.  (Id.)  Plaintiff did not have a supervisor at UMC.  (Id.)  There were times when Plaintiff's supervisor told him to train people at different locations, but most of the time, managers within the various departments that Plaintiff served would contact Plaintiff directly.  (Id.)  For example, the director of radiology would directly communicate with Plaintiff if that department needed training, and Plaintiff would assist.  (Id.)  Plaintiff, and others in similar roles, would maintain relationships with managers within the

departments that they served to make sure that they were providing them with the services they needed.  (Id.)  The department managers were not Plaintiff's supervisors.  (Id.)

**B.  Plaintiff's Performance**

On November 5, 2017, when Plaintiff was promoted to the IS Architect 2 position at USS, Plaintiff became an exempt salaried employee.  (USS SUF ¶¶ 6-7.)  Plaintiff was the first person on the training side in his department to be in the Architect role.  (Id. ¶ 8.)  Plaintiff defined "what that role did" as he encountered the needs of the organization.  (Id. ¶ 9.)

In June and July of 2018, Plaintiff had several discussions with Executive Director, Anna Finegan-Redell ("Finegan-Redell") due to performance and attendance issues.  (Id. ¶ 10.) Finegan-Redell discussed with Plaintiff that, as the training architect, he should not require the level of "oversight and guidance" he was seeking.  (Id. ¶ 11.)  Finegan-Redell also advised Plaintiff that he was expected to complete an 8.5 hour workday and he was not consistently meeting that expectation.  (Id. ¶ 12.)

On July 19, 2018, Plaintiff's direct supervisor, Solis, and Finegan-Redell met with Plaintiff to discuss performance issues and outline goals for improvement.  (Id. ¶ 13.)  One of the issues discussed with Plaintiff during this meeting was Plaintiff being available to others during business hours.  (Id. ¶ 14.)

In the beginning or middle of 2018, USS started to implement a work-from-home program.  (Id. ¶ 33.)  Around that time, Plaintiff asked to participate in the program but was told that there were "certain things" USS needed to see from him before he participated in the program.  (Id.)

**C.  FMLA/CFRA Leave**

In 2018, Plaintiff began to suffer from severe panic attacks and was diagnosed with a panic disorder.  ("Mattison Declaration," ¶ 1, Dkt. No. 62-14.)  His panic attacks "substantially limit the major life activities of thinking, concentrating and sleeping among other things."  (Id.)

In or around October 2018, Plaintiff made an inquiry to the leaves and accommodations department regarding how to request an accommodation.  (USS SUF ¶ 15.)  On October 30, 2018, Erica Bolton ("Bolton"), Accommodations Specialist, informed Plaintiff how to request accommodations.  (Id. ¶ 16.)  On November 5, 2018, Plaintiff requested an accommodation for time off from work for two days per week for a two-week period beginning from October 29, 2018, to November 16, 2018.  (Id. ¶ 17.)  Because Plaintiff's request for leave was eligible as an intermittent leave under FMLA/CFRA, the request was referred to an FMLA specialist for processing.  (Id. ¶ 18.)  Plaintiff was advised that he would need to provide a certification from his healthcare provider.  (Id. ¶ 19.)  Plaintiff provided a certification from his health care provider, and at that time requested consecutive leave for November 27, 2018, to December 12, 2018 and

**CIVIL MINUTES—GENERAL**

for January 4, 2019 to March 3, 2019, rather than intermittent leave.  (<u>Id.</u>)  Both of Plaintiff's leave requests were approved.  (<u>Id.</u> ¶ 20.)

On November 27, 2018, Plaintiff took his first approved protected FMLA/CFRA leave of absence until December 12, 2018.  (<u>Id.</u> ¶ 21.)  Plaintiff then used vacation time from December 13, 2018, through January 3, 2019.  (<u>Id.</u> ¶ 22.)  On January 4, 2019, Plaintiff took his second protected FMLA/CFRA leave of absence.  (<u>Id.</u> ¶ 23.)  Plaintiff "entered an intensive outpatient therapy program that met Monday through Friday all day."  (Mattison Decl. ¶ 4.)

In late January or early February 2019, Solis called Plaintiff to check in on him.  (Pl.'s Response to USS SUF ¶ 25.)  Plaintiff testified that in that call, he was "made aware" that USS "needed [him] to get back to work."  (<u>Id.</u>)  Solis "made clear that [he] may not have [his] salaried position when [he] returned."  (Mattison Decl. ¶ 4.)  Plaintiff felt that if he didn't go back to work, his "job was probably going to be in jeopardy."  (Pl.'s Response to USS SUF ¶ 25.)  Based on that conversation, Plaintiff asked his clinician at the Behavioral Medicine Center to allow him to go back to work earlier because he was afraid that he may not have a job when he returned to work.  (<u>Id.</u>; Mattison Decl. ¶ 4. )  On February 8, 2019, Plaintiff's clinician wrote him a note authorizing that he could return to work on February 19, 2019.  (USS SUF ¶ 24.)  Plaintiff did not utilize the entirety of his medical leave that he was approved for.  (<u>Id.</u> ¶ 25.)  Plaintiff testified that at the time of the phone call he "was still in treatment," and it "was going very well."  (Pl.'s Response to USS SUF ¶ 25.)  Plaintiff "would have benefitted from continuing [his] treatment."  (Mattison Decl. ¶ 4.)  Plaintiff testified that if Solis had not called him, he would have continued his FMLA leave through March 3, 2019.  (Pl.'s Response to USS SUF ¶ 25.)

**D.  February 19, 2019 Meeting**

On February 19, 2019, Plaintiff returned to work and met with Solis and Finegan-Redell. (USS SUF ¶ 26.)  It is normal practice for Solis to meet with employees returning from leave. (<u>Id.</u> ¶ 27.)  The purpose of the meeting was to re-introduce Plaintiff to his work, and for Plaintiff to evaluate what works best for him in terms of his professional and personal goals.  (<u>Id.</u> ¶ 28.) During the meeting, Solis explained that Plaintiff was expected to begin work between 8:30 a.m. and 9 a.m. and to update his calendar when he was out of the office.  (<u>Id.</u> ¶ 29.)

Plaintiff testified that during the meeting, Finegan-Redell asked him if there were any "accommodations" that he needed.  (Pl.'s Response to USS SUF ¶ 28.)  Plaintiff requested that he be able to work from home either a day or a couple of days during the week.  (<u>Id.</u>)  Plaintiff stated that the work from home program "would be really beneficial" because it "would accommodate . . . what [he was] experiencing as far as panic attacks and . . . the anxiety" he had. (PSUF to USS MSJ ¶ 9.)  Working from home "would give [him] that moment of pause that's necessary at times" and it would "be tremendously helpful" because he wouldn't "have distractions and things popping up where [he] can readjust to what's going on."  (<u>Id.</u> ¶ 21.)  Solis does not recall that Finegan-Redell asked Plaintiff what accommodations he would need upon his return to work, but he does recall that Plaintiff "expressed a desire to have voluntarily

telecommuting work set up through [the] normal remote day request process." (Response to PMSJ PSUF ¶ 32.) In response to Plaintiff's request to work from home, Finegan-Redell told him that there were "certain things" that they wanted to see change about Plaintiff's work before they'd be willing to grant him a work-from-home day and that they would talk about what those changes were over the coming weeks. (Pl.'s Response to USS SUF ¶ 28.) Finegan-Redell did not grant Plaintiff's request to work from home. (Id.)

Plaintiff also testified that during the meeting he was given an "ultimatum to either stay" in the position he was currently in "or to be demoted back into the prior job . . . principal trainer or instructional designer," given the health issues that he had been having. (PMSJ PSUF ¶ 26; Mattison Dep., 127:20-128:7.) He testified that if he didn't demote "things were going to get harder" and he "didn't know if that job was going to be available to [him] still." (PMSJ PSUF ¶ 26.) Plaintiff testified that Finegan-Redell and Solis did not tell him that he had to go back to his previous position, but that he felt that this was a "high-pressure situation because [he] didn't particularly want [his] health to be a determining factor." (Mattison Dep., 127:20-128:7.) Plaintiff testified that "after the pressure of that meeting, [he] needed to make a decision within the next couple of weeks." (Pl.'s Response to USS SUF ¶ 28.)

**E. February 21, 2019 Email to Human Resources**

On February 21, 2019, Plaintiff sent a detailed email to Courtney Fry ("Fry"), Employee Relations Assistant, outlining the February 19, 2019, meeting that he had with Solis and Finegan-Redell. (USS SUF ¶ 37.) In that email, Plaintiff wrote that he was told he "could keep [his] current job with the expectation of different performance, or go back to [his] previous job." (Id.) He was also told that if he chose to keep his current job, there would be a "60-90 day period of" evaluation. (Id.) Plaintiff wrote that Finegan-Redell told him that "she would have liked to see better performance from [him] in the 8 months previous to [his] medical leave and that was why she wanted to give [him] a choice to continue or essentially be demoted to [his] previous position." (Id.) Plaintiff wrote that during the "8 month period" that Finegan-Redell referred to, he was "dealing with the medical condition that he had to go on leave for." (Id.) Plaintiff wrote that the "close proximity" of his conversation with Solis and Finegan-Redell to his "return to work from medical leave felt cumbersome and uncomfortable." (Id. ¶ 39.) In the email, Plaintiff did not make any reference to an accommodation request. (Id. ¶ 41.)

Fry forwarded Plaintiff's email to the Human Resources Partner assigned to Plaintiff's department, Isaac Jang ("Jang"). (Id. ¶ 42.) Jang contacted Plaintiff to coordinate an in-person meeting to discuss his February 19, 2019, email. (Id. ¶ 43.) On February 25, 2019, Plaintiff met with Jang. (Id. ¶ 43.) During the meeting, Plaintiff told Jang that he had some prior conversations with management about his performance and expectations of his role in June or July 2018. (Id. ¶ 44.) Plaintiff informed Jang that on the day he returned to work, Finegan-Redell asked him if he wanted to go back to his previous job. (Id.) Plaintiff told Jang that during the meeting with Solis and Finegan-Redell, he was asked what he could use to help him be successful in his job. (Id. ¶ 47.) Jang gave Plaintiff "some suggestions during the meeting to

help him try to clarify the performance expectations going forward." (Id. ¶ 48.) Jang did not take any action after the meeting. (Pl.'s Response to USS SUF ¶ 45.)

## F. Email Exchange with Abilities Accommodations Specialist

Between February 25, 2019, and February 27, 2019, Bolton engaged in an email exchange with Plaintiff regarding his prior request for intermittent leave from October 29, 2018, to November 16, 2018. (USS SUF ¶ 49.) Bolton informed Plaintiff to contact her if he ever needed any further assistance or an accommodation. (Id.) Plaintiff did not request any new accommodations from Bolton, such as an accommodation of a remote workday. (Id. ¶ 50.) Plaintiff declares that Bolton did not indicate in her email that she was communicating with him at the behest of his supervisors or because his accommodation request had been rejected. (Mattison Decl. ¶ 9.) He declares that there was "no indication that" Bolton was communicating with him "to begin the interactive process regarding [his] most recent request as she had in the past." (Id.) Plaintiff declares that his conversation with Solis and Finegan-Redell gave him the understanding that he was not going to be accommodated, "which is part of the reason [he] complained to HR." (Id. ¶ 6.)

## G. Demotion

On April 2, 2019, Plaintiff requested a demotion from IS Architect 2 to IT Instructional Designer. (USS SUF ¶ 51.) Plaintiff emailed Solis saying, "After giving it much thought, I think it is best right now that I step away from the architect role go back to my role as a principal trainer, I am excited to grow in my career at Loma Linda, but I think taking this time to focus on my health is the best decision for the time being. Thank you." (Id.)

Plaintiff testified that it "was ultimately [his] decision [to request the demotion], although there was a lot of pressure and coercion from the people that [he] reported to, to go back to it." (Id. ¶ 52.) Plaintiff explains that the pressure included the following: he was "forced to return early from FMLA leave, [he] was given an ultimatum to give up [his] salaried position, [he] was denied an accommodation . . . to work from home . . . [and] was forced to earn the accommodation," and Jang had told him that Finegan-Redell and Solis's actions "were not illegal." (Mattison Decl. ¶¶ 7-8.)

Plaintiff's request to return to his prior role was reviewed by employee relations and granted. (USS SUF ¶ 54.) Plaintiff received a step-increase in pay from his prior role. (Id.)

## H. Timecard

In returning to his role as a principal trainer, Plaintiff once again became an hourly, non-exempt employee. (Id. ¶ 55.) As an hourly employee, Plaintiff was required to clock in and out of the payroll system for all hours worked and all breaks taken. (Id.) In April of 2019, Cook became the executive director in the IS department which oversaw Plaintiff's employment. (USS SUF ¶

56.)  Cook directly supervised Plaintiff's manager, Solis, at that time.  (Id.)  Prior to April 2019, Cook was not Plaintiff's supervisor in any capacity.  (Id.)

As early as May 8, 2019, Plaintiff began clocking in from home and then would arrive about 30 minutes later at his office building using his employee badge to enter his office located at the Mountain View Plaza.  (Id. ¶ 57.)  Plaintiff lives "5 minutes away, or roughly a mile from the Mountain View Plaza location."  (Id. ¶ 59.)

On July 26, 2019, Solis informed Cook that Plaintiff had previously asked for a remote work day, but Solis did not approve his request because he "had specific things he needed to improve before [they] could discuss remote work (he has not currently met these improvement goals)".  (PSUF to USS MSJ ¶ 34.)

From August 12, 2019, to August 23, 2019, Plaintiff was "clocking in from home, checking emails" and his "schedule, and then commuting into work."  (USS SUF ¶ 58.)  Plaintiff's schedule "was broken up during that time" between credentialing staff off-site at the partner hospital in Riverside and working at the Mountain View Plaza office.  (Id. ¶ 60.)  Solis told Plaintiff that if he was working at an "off-site" location (i.e., not at the Mountain View Plaza location) then he should remotely clock-in for work.  (Id.)

Solis testified that he knew as of June or July of 2019 that Plaintiff was logging into his computer and checking his email prior to going to work because Plaintiff "made [him] aware" of it.  (Pl.'s Response to USS SUF ¶ 61.)  Solis testified that he did not have a problem with Plaintiff logging into his computer prior to going to the office, but the problem was that he was not available "when incidents were coming in despite being logged in, [and] that he was not clocking out to commute into the office."  (Id.)  Solis does not recall if he had a conversation with Plaintiff letting him know that he needed to log out from his computer when he commuted to the office, but that is a policy that USS reviews each year and that Plaintiff would have signed off on.  (Id.)

Plaintiff testified that there were multiple employees who clocked in from their homes, checked their emails, and then drove to their office location.  (Id.)  Plaintiff testified that Solis told him and other employees that when employees visited an off-site location "or those times when its hectic," an employee can clock in from home and then drive to where they need to go.  (Id.)  Plaintiff declares that he understood that his actions of logging into his computer from home to check his email, calendar, prepare for the day, and then commute for five minutes to get to his office, was an action that was allowed based on his conversations with Solis.  (Mattison Decl. ¶ 10.)  Plaintiff states that "commuting was an approved activity based on what other employees were doing."  (Id.)  Plaintiff does not have any documentation showing that Solis allowed Plaintiff to clock in from home.  (USS SUF ¶ 61.)

On August 16, 2019, Plaintiff was assigned a high priority ticket which was not addressed, so Solis called him and heard a lot of background noise over the phone.  (USS SUF ¶ 62.)  Plaintiff said at the time that he was at work in the office but Cook later saw Plaintiff badge and

enter the Mountain View Plaza office location around 9:00 a.m. with all of his belongings even though the API system[3] recorded that he had been clocked in since 8:30 a.m. (Id.)

On August 21, 2019, Solis observed Plaintiff driving into the parking lot at the Mountain View Plaza office at 9:08 a.m., but when Cook checked Plaintiff's API for the day, it reflected that Plaintiff had clocked into the API system at 8:42 a.m. (Id. ¶ 63.) Cook noted this behavior had occurred the entire week—Plaintiff was clocking in between 8:30 a.m. and 8:45 a.m. and Solis and/or Cook observed that he arrived to work after 9:00 a.m. (Id.) Cook also noted that Plaintiff's calendar reflected that he had a "Private Appointment" on August 20, 2019, at a time when he was "on the clock," and he did not clock out for that appointment. (Id.) Cook worked with Jang to obtain Plaintiff's badge-in data and to compare when Plaintiff arrived to campus and when he clocked into API. (Id.)

On August 22, 2019, Cook received Plaintiff's badge-in records which showed he had consistently badged in around 9:00 a.m. or later even though his API clock-ins were typically documented at 8:30 a.m. (Id. ¶ 64.) That day Cook asked Plaintiff where he was on the morning of August 16, 2019, and Plaintiff said he could not remember. (Id. ¶ 65.) Cook told him that she had observed that his timecard shows that he clocks in at 8:30 a.m., but he does not arrive to work until around 9:00 a.m. (Id. ¶ 66.) Plaintiff first stated that he clocks in when he is at work, but then admitted that he clocks in remotely while he is at home in the morning before beginning his commute to work. (Id. ¶¶ 67-69.)

In mid-August 2019, Cook informed Plaintiff that she was reporting him to HR to conduct an investigation against him for time-card fraud. (Mattison Decl. ¶ 11.) Plaintiff asked her if he could change his time-card to her satisfaction "given that [they] were still in the pay period and she agreed." (Id.) Plaintiff "believed that [he] had not violated any rule because Bryan Solis had approved [his] actions on multiple occasions as well as informing [him] that [he] was in a safe place." (Id.)

On August 27, 2019, Plaintiff was "ushered into a meeting with Bryan Solis and Eric Morales [, Director of Clinical Applications,] where [he] was told [he] was being terminated for time-card fraud." (Id.) Plaintiff was "devastated and protested that [he] had not been given the opportunity to tell his side of the story which included the fact that Bryan Solis had authorized [his] actions." (Id.) That day, Morales, on behalf of USS, sent Plaintiff a letter that stated:

> We developed concerns about your attendance when we noticed that you were not present in the office on August 16, 2019, despite being clocked in on API. Over the next several days, we continued to monitor your attendance and noticed that you would arrive in the office at around 9 am although API showed that you had clocked in earlier. When we asked you about this, you revealed to us that you had been clocking in at home before arriving in the office. Alex, this is considered falsification

---

[3] Neither party explains what is the "API system". The Court assumes it is a software that employees use to clock in and out of work.

of your timecard. Accordingly, the decision has been made to terminate your employment effective 08/27/2019."

(USS SUF ¶ 72.)

USS's "practice is typically a final warning for time card falsification." (Pl.'s Response to USS SUF ¶ 62.) Plaintiff was not given a final warning. (PSUF to USS MSJ ¶ 34.)

Plaintiff's employment separation notice states, "Loma Linda University Health," and USS is selected as his company. (Pl.'s Response to UMC SUF ¶ 10.) When asked which Loma Linda entity he was employed with at the time of termination, Plaintiff testified that he believes he was employed with USS but that he is not sure because there was "some reorganization," and he "went to the same human resources [department prior to and after the reorganization]."[4] (Pl.'s Response to UMC SUF ¶ 3.)

## IV.   LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

"When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that 'the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008). This is

---

[4] UMC objects to Plaintiff's testimony on the basis of being inconsistent with prior deposition testimony, lack of personal knowledge, and lack of foundation. (See PMSJ Opp'n Evid. Objections at 2.) UMC does not explain how Plaintiff's testimony is inconsistent with his prior deposition testimony and the Court does not find that it is. As to personal knowledge, Fed. R. Evid. 602 requires that a witness's testimony be based on events perceived by the witness. Los Angeles Times Commc'ns, LLC v. Dep't of Army, 442 F. Supp. 2d 880, 886 (C.D. Cal. 2006). Here, Plaintiff has personal knowledge of which company he believes employed him at the time of his termination. As to lack of foundation, UMC does not explain why this testimony lacks foundation and merely cites to Taylor v. United States, 759 A.2d 604 (D.C. 2000) ("Taylor"). Taylor asserts that courts are obligated to make a thorough foundational inquiry as to the reliability of demonstrative evidence. Id. There is no demonstrative evidence discussed here, thus, Taylor is inapplicable. Accordingly, the Court **OVERRULES** UMC's objections.

"ordinarily a heavy burden." Barnes v. Sea Haw. Rafting, LLC, 889 F.3d 517, 537 (9th Cir. 2018). By contrast, where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Celotex, 477 U.S. at 325. Instead, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Id. However, if the moving party has sustained its burden, the non-moving party must show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Id. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

Cross-motions for summary judgment "must be considered on [their] own merits." Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001); Acosta v. City Nat'l Corp., 922 F.3d 880, 885 (9th Cir. 2019). Courts must review the evidence submitted in support of each cross-motion, and "give the nonmoving party in each instance the benefit of all reasonable inferences." Am. Civil Liberties Union of Nev. v. City of Las Vegas, 466 F.3d 784, 791 (9th Cir. 2006); Tulalip Tribes of Wash. v. Washington, 783 F.3d 1151, 1156 (9th Cir. 2015).

## V.    DISCUSSION

Plaintiff moves for summary judgment on his: (1) FMLA/CFRA interference claim; and (2) the issue of whether USS and UMC are joint employers for liability purposes. (See PMSJ.) UMC moves for summary judgment on its joint employer liability. (See UMC MSJ.) USS moves for summary judgment on all of Plaintiff's claims. (See USS MSJ.) The Court first

determines whether USS and UMC are joint employers and then whether Plaintiff's claims are subject to summary judgment.

## A. UMC's Liability

Both UMC and Plaintiff move for summary judgment on the issue of whether UMC and USS are joint employers. (See UMC MSJ and PMSJ.) Furthermore, although in his SAC, Plaintiff solely alleged that UMC and USS are joint employers, in his briefing Plaintiff now also argues that UMC and USS are the same entity. (UMC MSJ Opp'n at 4.) Accordingly, the Court considers whether UMC was Plaintiff's joint employer and whether UMC and USS constitute Plaintiff's single employer.

### 1. Joint Employer Liability

Courts have used a variety of multi-factor tests to determine whether a defendant is a joint employer. DelGiacco v. Cox Commc'ns, Inc., 2015 WL 1535260, at *7 (C.D. Cal. Apr. 6, 2015). For FEHA claims, courts consider the following factors:

> [1] payment of salary or other employment benefits and Social Security taxes, [2] the ownership of the equipment necessary to performance of the job, the location where the work is performed, [3] the obligation of the defendant to train the employee, [4] the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, [5] the authority to establish work schedules and assignments, [6] the defendant's discretion to determine the amount of compensation earned by the employee, [7] the skill required of the work performed and the extent to which it is done under the direction of a supervisor, [8] whether the work is part of the defendant's regular business operations, [9] the skill required in the particular occupation, [10] the duration of the relationship of the parties, and [11] the duration of the plaintiff's employment.

Urrutia v. Chipotle Mexican Grill, Inc., 2017 WL 2901717, at *13 (C.D. Cal. June 16, 2017) (quoting Rhodes v. Sutter Health, 949 F. Supp. 2d 997, 1003 (E.D. Cal. 2013)). "Of these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important." Vernon v. State of California, 116 Cal. App. 4th 114, 126 (2004). Further, "the control an organization asserts must be significant and there must be a sufficient indicia of an interrelationship ... to justify the belief on the part of an aggrieved employee that the alleged co-employer is jointly responsible for the acts of the immediate employer." Vernon, 116 Cal. App. 4th at 126 (internal citations and alterations omitted). "The right to control the employment relationship which is essential to subject the defendant to liability is evaluated by focusing on an examination of defendant's role with respect to the right to hire, fire, transfer, promote, discipline, set the terms, conditions and privileges of employment, train and pay the plaintiff." Id. (internal quotations omitted).

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk NP

For the Americans with Disabilities Act ("ADA") and ADAAA claims, courts turn to common-law agency principles to analyze the existence of an employer-employee relationship. U.S. Equal Emp. Opportunity Comm'n v. Glob. Horizons, Inc., 915 F.3d 631, 638 (9th Cir. 2019); see Haro v. KRM, Inc., 2022 WL 980249, at *3 (D. Nev. Mar. 30, 2022) (applying common-law test to ADA claims); Eisenberg v. Permanente Med. Grp., 855 F. Supp. 2d 1002, 1010 (N.D. Cal. 2012) (applying common-law test to ADA claims). Under the common-law test, "the principal guidepost is the element of control—that is, the extent of control that one may exercise over the details of the work of the other." U.S. Equal Emp. Opportunity Comm'n, 915 F.3d at 638 (internal quotes omitted). When analyzing whether the requisite control exists, courts review the following factors:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Id. There is "no shorthand formula for determining whether an employment relationship exists, so all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Id. (internal quotes omitted).

For FMLA/CFRA claims, courts have applied two tests. The first is the Bonnette test which notes that the joint employment determination requires consideration of the total employment situation, but focuses primarily on four factors: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records." Moreau v. Air France, 356 F.3d 942, 947 (9th Cir. 2004) (quoting Bonnette v. California Health and Welfare Agency, 704 F.2d 1465 (9th Cir. 1983) ("Bonnette"), disapproved of by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985), on other grounds). The second test is the Torres-Lopez test, which follows "Bonnette's direction to consider all factors relevant to the particular situation in evaluating the economic reality of an alleged joint employment relationship." Moreau v. Air France, 356 F.3d at 947 (citing Torres-Lopez v. May, 111 F.3d 633, 639 (9th Cir. 1997) ("Torres-Lopez")). There the Ninth Circuit considered the following factors: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates of the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (5) preparation of payroll and the payment of wages." Id.

What all the tests listed above "have in common is their focus on the extent to which the defendant has day-to-day control over the plaintiff's work." DelGiacco, 2015 WL 1535260, at *7.

"The inquiry tends to be intensely fact-dependent and the ultimate determination is based on the totality of the circumstances; there is no magical formula." Id.

UMC argues that it is not Plaintiff's joint employer because it did not exercise control over Plaintiff's wages, hours, or working conditions.[5] (UMC MSJ at 5.) To support its contention, UMC argues that after Plaintiff transitioned from UHC[6] to USS, all the documents that Plaintiff received from his employer indicate that they were from USS, not UMC. (UMC MSJ at 6.) For example, Plaintiff's performance evaluations include the USS logo and state that the facility name of his evaluator is USS. (Id.) Plaintiff contends that some of his pay stubs state "Loma Linda University Health Services" and not USS. (Pl.'s Response to UMC SUF ¶ 10.) But Loma Linda University Health Services is USS's prior name.[7]

UMC asserts that it never set Plaintiff's wages, supervised his daily work, or played any part in his termination. (UMC MSJ at 6.) To support its contention, UMC highlights Plaintiff's testimony where he states that he did not have a supervisor at UMC and he believes, but is not sure, that at the time of his termination he was employed by USS. (Id.) UMC asserts that the fact that Plaintiff testified that he did not have supervisors at UMC and the fact that his performance evaluations state that the facility name of his evaluator is USS demonstrate that his supervisors worked for USS. (Id.) But Plaintiff highlights that his email correspondence signatures and that of Solis and Cook state "Loma Linda University Health." (Pl.'s Response to UMC SUF ¶ 10.) And Plaintiff points out that his timecard reports state UHC. (Pl.'s Response

_____

[5] The Court notes that UMC asserts that the correct test to apply to determine joint employer liability is the test outlined in Martinez v. Combs, 49 Cal. 4th 35, 63-66 (2010), as modified (June 9, 2010) ("Martinez"). (See USS MSJ.) The Martinez test applies to actions brought under California Labor Code § 1194 which provides a right to sue for unpaid minimum wages or overtime compensation. 49 Cal. 4th at 62. Here, Plaintiff has not brought such a claim. Thus, the Martinez test is inapplicable.

[6] On January 5, 2012, Plaintiff was hired as a Project Principal Trainer for UHC, which "was controlled" by UMC, a separate entity. (UMC SUF ¶ 1.) On December 20, 2015, Plaintiff was transitioned from UHC to USS and he maintained his position as a Project Principal Trainer. (Id. ¶ 2.) Plaintiff alleges no specific act of discrimination or harassment until November 27, 2018, almost three years after Plaintiff transitioned from UHC to USS. (UMC SUF ¶ 6.)

[7] The Court takes judicial notice of the business entity profile of USS on the California Secretary of State's website. See Gerritsen v. Warner Bros. Ent. Inc., 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015) (taking judicial notice of the California Secretary of State's website). The California Secretary State website states that in 2004, Loma Linda University Service Resources, Inc. was incorporated. See California Secretary of State, https://bizfileonline.sos.ca.gov/search/business (last visited March 10, 2023). In 2005, the name for that entity changed to Loma Linda University Health Services, Inc. (Id.) In 2015, the name changed again to Loma Linda University Shared Services (USS). (Id.)

_____

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk NP

to UMC SUF ¶ 10.)  Neither party explains what relationship Loma Linda University Health ("UH") has to UMC, USS, or UHC.  But based on the articles of incorporation for UH and UHC, of which the Court took judicial notice of above, they both seem to be to be separate entities from UMC.  (See UMC RJN 1 and UMC RJN 2.)  Thus, the Court does not find that the different labels of UH or UHC on Plaintiff's and his supervisors' signatures or timecard report establish that UMC is Plaintiff's joint employer.  See Brown v. Arizona, 2011 WL 2911054, at *3 (D. Ariz. July 20, 2011) ("when the purported joint employer's name appears on various employment-related documents, this does not in itself create a joint employment relationship").

Plaintiff argues that UMC has an employment relationship over Plaintiff because he serviced departments at UMC.  (UMC MSJ Opp'n at 4.)  Plaintiff testified that as part of his position, Plaintiff serviced various Loma Linda entities, and he would often go to UMC to provide support or trainings.  (Id. at 4-5; Pl.'s Response to UMC SUF ¶ 8.)  Plaintiff's supervisor would either tell him to train people at different locations or, most of the time, managers within various departments would contact Plaintiff directly.  (Id.)  Notably, the department managers were not Plaintiff's supervisors.  (Id.)  Thus, the relationships between UMC department managers and Plaintiff seem to be client-based; UMC department managers were Plaintiff's clients not his supervisors.  The Court finds that Plaintiff's client-based relationship with UMC does not support an inference that UMC was Plaintiff's joint employer.

Plaintiff also argues that even if UMC does not have direct control over Plaintiff, it is sufficient to show that UMC has indirect control to establish a joint employer relationship.  (MSJ Opp'n at 4 (citing Medina v. Equilon Enterprises, LLC, 68 Cal. App. 5th 868 (2021) ("Medina").)  Medina is inapplicable to this case, because there the court applied the Martinez test to a manager's wage-and-hour claim.  Medina, 68 Cal. App. 5th 868.  No such claim is brought in this case.  But since both parties discuss Medina and some of the factors there overlap with the factors included in the tests mentioned above, the Court will address it.  In Medina, the court stated that a joint employer relationship may be established by indirect control, but sufficient evidence needs to be presented to show that the employer "exercises enough control" to "indirectly dictate the wages, hours, or working conditions of the employee."  Medina, 68 Cal. App. 5th at 879.  In Medina, the court found that the owner of gas stations, who operated its stations through the use of contracts with separate operators, was a joint employer of a gas station manager, along with the operator, for the following reasons: the owner provided detailed technical instructions for managing stations; deviations from the owner's standards were prohibited; employees could be fired for violating the owner's policies; and the owner's system of unilaterally setting reimbursement for labor costs while mandating hours of operation for the stations had the practical effect of controlling the operator's finances, day-to-day operations, facilities, and practices.  Id.

Unlike in Medina, Plaintiff has not provided evidence that UMC had such control over USS.  Plaintiff's only evidence is that after he transitioned from UHC to USS, his physical place of work did not change, his tasks did not change, and he reported to the USS Human Resources department before he transitioned from UHC to USS and after the transition.  (UMC Opp'n at 8; Pl.'s Response to UMC SUF ¶ 6.)  This evidence is insufficient to show or create a triable

issue of fact that UMC, through USS, had control over Plaintiff.  See Rhodes, 949 F. Supp. 2d at 1003 (finding that operator of health clinic was not radiologist's joint employer because although operator owned location where radiologist worked and had joint operating policies with medical group, medical group paid radiologist's salary, determined the amount of her compensation and benefits, hired her, gave her work assignments, and operator had no authority to discipline, promote, transfer, or terminate radiologist); Urrutia, 2017 WL 2901717, at *14 (finding that parent entity was not a joint employer because plaintiff failed to provide evidence that: the parent entity implemented policies or exercised day-to-day control over plaintiff's daily work activities, the parent entity directly paid his wages, or that the parent entity could terminate him without cause); Vernon, 116 Cal. App. 4th at 126 (finding that ultimate control over city firefighter's employment was exercised exclusively by the city and not the state because the state did not compensate, hire, train, supervise, discipline, or promote the firefighter); Eisenberg, 855 F. Supp. 2d at 1010 (finding that plaintiff's declaration asserting that Kaiser (without differentiation to any specific Kaiser entity) had control over his staff along with his employment application and resignation letter which suggested an interrelatedness between the Kaiser entities was insufficient to show an employer-employee relationship).  Absent evidence that UMC paid his salary, had the authority to discipline, promote, or terminate Plaintiff, and exercised day-to-day control over Plaintiff's work activities, the Court is unable to find that there is a triable issue of material fact that UMC had control over Plaintiff.

Accordingly, the Court **GRANTS** UMC summary judgment as to Plaintiff's joint employer liability theory.  For all the reasons discussed above, the Court also **DENIES** Plaintiff's motion for partial summary judgment on his joint employer liability theory.

### 2.  Integrated Enterprise Test

As stated above, Plaintiff also asserts that UMC and USS are a single entity and he invokes the integrated enterprise theory.  (UMC MSJ Opp'n at 5-7.)  The integrated enterprise test determines whether two separate corporate entities should be considered a single employer.  Rhodes v. Sutter Health, 949 F. Supp. 2d 997, 1003 (E.D. Cal. 2013).  "The Ninth Circuit uses the integrated enterprise test for a limited purpose," Antoine v. BAE Sys., Inc., 2018 WL 11471623, at *10 (N.D. Cal. July 30, 2018) (internal quotes omitted), which is to determine whether a "plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15-employee minimum standard necessary to hold an employer liable under Title VII."  Rhodes, 949 F. Supp. 2d at 1006 (internal alterations omitted).  In other words, the test does not determine joint liability as Plaintiff suggests, but instead determines whether a defendant can meet the statutory criteria of an 'employer' for Title VII applicability."  Anderson v. Pac. Mar. Ass'n, 336 F.3d 924, 928 (9th Cir. 2003).  "Because Title VII and the ADA include the same 15-employee threshold and statutory enforcement scheme," the integrated enterprise doctrine "applies equally under the ADA."  Buchanan v. Watkins & Letofsky, LLP, 30 F.4th 874, 878 (9th Cir. 2022).

Here, it is undisputed that Plaintiff's direct employer, USS, employed at least 15 employees. (Pl.'s Response to UMC SUF ¶ 6 (there are about 2,200 employees in USS).) Because that places USS within ADA's statutory coverage as an employer, the integrated test is inapplicable to Plaintiff's ADA claim. See Antoine, 2018 WL 11471623, at *10 (finding that the integrated test was inapplicable because plaintiff's direct employer employed at least 15 employees).

However, California has employed the integrated enterprise test as an independent basis for determining FEHA liability. And some courts have applied the test to an FMLA claim and CFRA claim. See DelGiacco, 2015 WL 1535260, at *5; Buffington v. Nestle Healthcare Nutrition, Inc., 2019 WL 3063515, at *5 (C.D. Cal. May 3, 2019). Accordingly, the Court turns to the merits of Plaintiff's integrated enterprise analysis.

When applying the integrated enterprise test, courts consider four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. Kang v. U. Lim Am., Inc., 296 F.3d 810, 815 (9th Cir.2002). "The third factor, centralized control of labor relations, is the 'most critical.'" Antoine, 2018 WL 11471623, at *11 (quoting Kang, 296 F.3d at 815 (integrated enterprise existed where parent company "had essentially complete control over [subsidiary's] labor relations," including the ability to hire, fire, and supervise employees)); see Laird v. Cap. Cities/ABC, Inc., 68 Cal. App. 4th 727 (1998) (finding no integrated enterprise absent evidence that the parent company exercised day-to-day control over the subsidiary's employment decisions); see also Miller v. Swiss Re Underwriters Agency, Inc., 2010 WL 935697, at *2 (C.D. Cal. Mar. 15, 2010) ("corporate entities are presumed to have separate existences").

Here, Plaintiff asserts that the following factors establish that UMC and USS are the same entity: UMC and USS are located on the same campus; UMC's and USS's tax forms show that they share personnel, funding, and financial control; for example, the same individual holds the CFO position for UMC and USS and another individual holds the VP of Human Resources Management for both UMC and USS. (UMC MSJ Opp'n at 6-7.) Plaintiff's evidence lacks foundation because he did not provide any support for this evidence other than by including in his opposition a table that he created, "Table A," which is purportedly information obtained from UMC's and USS's tax returns, but those tax returns were not provided to this Court. (See UMC MSJ Opp'n at 5-6.)

Even if the Court considered the inadmissible evidence, it is insufficient to establish that UMC and USS are the same entity. "The critical question is, '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" Antoine, 2018 WL 11471623, at *11 (quoting Laird, 68 Cal. App. 4th at 738). The fact that UMC and USS may share corporate officers, administrators, and funding does not establish that UMC was the entity that made final decisions regarding Plaintiff. Antoine, 2018 WL 11471623, at *11 (finding that fact that ubiquitous logos, centralized control of policies, central control of administrative work and payroll/benefits, as well as shared corporate officers and administrators was insufficient to show an integrated enterprise); see Buffington v. Nestle Healthcare Nutrition,

Inc., 2019 WL 3063515, at *7 (C.D. Cal. May 3, 2019) (although two entities had the same tax manager and shared the same business address this was insufficient to establish an integrated enterprise); cf. Buchanan v. Watkins & Letofsky, LLP, 30 F.4th 874, 878 (9th Cir. 2022) (finding that there was triable issue of material fact as to whether two entities were an integrated enterprise because the two entities shared a website, toll free number, email templates, operational and administrative work, an IRS taxpayer information number, and managed all significant employment matters including hiring, firing, discipline, performance evaluations, scheduling and compensation).  Accordingly, because no reasonably jury could find that UMC is the same entity as USS, the Court **GRANTS** UMC summary judgment as to Plaintiff's integrated enterprise theory.  For all the reasons discussed above, the Court also **DENIES** Plaintiff's motion for partial summary judgment on his integrated enterprise theory.  UMC is **DISMISSED**.

## B.  Claim One and Two: FMLA/CFRA Interference

Both Plaintiff and USS move for summary judgment on Plaintiff's FMLA/CFRA interference claims.[8]  (See PMSJ; USS MSJ.)  USS argues that it did not interfere with Plaintiff's medical leave under FMLA because USS never denied his request for medical leave and when Plaintiff returned from his medical leave, it reinstated Plaintiff in the same position he had prior to his leave.  (USS MSJ at 11.)  Plaintiff contends that USS interfered with his FMLA medical leave in the following instances: (1) when his supervisor, Solis, contacted him while he was on leave; (2) when Executive Director Finegan-Redell denied his request to work-from-home a couple days a week and USS's Human Resources department did not act on his request; and (3) when Finegan-Redell gave him an ultimatum to be demoted to his previous position.  (See PMSJ.)  Given the overlapping claims and arguments, the Court considers the PMSJ and the USS MSJ together.

The FMLA provides job security and leave entitlements for employees who require leave for personal medical reasons, among others.  29 U.S.C. § 2612.  Specifically, the FMLA establishes two substantive rights for employees.  Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1122 (9th Cir. 2001).  First, a qualifying employee has the right to take up to 12 weeks of unpaid leave each year.  29 U.S.C § 2612(a).  Second, an employee who takes FMLA leave has the right to be restored to either her original position, or a position that is equivalent in benefits, pay, and conditions of employment upon her return.  Id. § 2614(a).  Notably, the FMLA does not entitle an employee to any rights, benefits, or positions to which the employee would not have been entitled had the employee not taken protected leave.  Id. § 2614(a)(3).  Rather, the FMLA guarantees that taking leave will not result in loss of job security or other adverse employment

---

[8] The Court analyzes Plaintiff's FMLA/CFRA interference claims together because "CFRA adopts the language of the FMLA and California state courts have held that the same standards apply."  Xin Liu v. Amway Corp., 347 F.3d 1125, 1132 n.4 (9th Cir. 2003); see Aguirre v. California, 2017 WL 5495953, at *14 (N.D. Cal. Nov. 16, 2017) ("In this Circuit, courts have taken up both the FMLA and CFRA claims together, treating them as substantively identical.").

actions.  Xin Liu v. Amway Corp., 347 F.3d 1125, 1132 (9th Cir. 2003).  There are two categories of claims under the FMLA—interference (or entitlement) claims in which an employee asserts that the employer has denied or otherwise interfered with substantive rights or entitlements under the FMLA (e.g., leave denial), and retaliation claims in which it is asserted that an employee was "subjected to an adverse employment action for taking FMLA protected leave." Id. n. 7; Chin, et al., Cal. Prac. Guide: Employment Litigation (The Rutter Group 2022) ¶ 12:1221.

Under the first category, the FMLA prohibits interference with the exercise of an employee's right to take leave.  29 U.S.C § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.")  Employers violate FMLA's prohibition on interfering with or restraining employee rights "by engaging in activity that tends to chill an employee's freedom to exercise his rights."  Bachelder, 259 F.3d at 1123 (internal alterations omitted).  The Ninth Circuit has "declined to apply the type of burden shifting framework recognized in McDonnell Douglas[9] to FMLA 'interference' claims; rather, '[an employee] can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both.'" Sanders v. City of Newport, 657 F.3d 772, 778 (9th Cir. 2011) (quoting Bachelder, 259 F.3d at 1125).  "In interference claims, the employer's intent is irrelevant to a determination of liability." Sanders, 657 F.3d at 778.

"To make out a prima facie case of FMLA interference, an employee must establish that (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled."  Escriba v. Foster Poultry Farms, Inc., 743 F.3d 1236, 1243 (9th Cir. 2014).  "A CFRA interference claim consists of the following elements: 1) the employee's entitlement to CFRA leave rights; and (2) the employer's interference with or denial of those rights."  Moore v. Regents of Univ. of California, 248 Cal. App. 4th 216, 250 (2016) (internal quotes omitted).  Here, the parties dispute the fourth and fifth factor of the FMLA and the second factor of the CFRA: whether Plaintiff provided sufficient notice of his intent to take leave after he returned from leave and whether USS denied Plaintiff FMLA benefits to which he was entitled to.  (USS MSJ at 11.)

---

[9] Under the McDonnell Douglas framework:

A plaintiff must first establish a prima facie case of discrimination.  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for its employment decision.  Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

### 1. Solis's Phone Call to Plaintiff

USS argues that it did not interfere with Plaintiff's medical leave because it did not deny Plaintiff's leave. (USS MSJ at 11.) Plaintiff argues that while he was on leave, his direct supervisor, Solis, called him which caused him to end his leave early, and thus, USS interfered with his right to take leave. (USS MSJ Opp'n at 6.)

The FMLA "statute and the accompanying regulations protect an employee from <u>any</u> employer actions that discourage or interfere with the right to take FMLA leave." <u>Xin Liu</u>, 347 F.3d at 1134. "[A]n employer has discouraged an employee from taking FMLA leave when his or her supervisor interferes with the length and dates of leave . . ." <u>Id.</u> (reversing district court's grant of summary judgment on plaintiff's interference claim because there was a triable issue of material fact as to whether defendant interfered with plaintiff's rights by denying her use of FMLA leave and pressuring her to reduce her leave time); <u>see also</u> <u>Marshall v. The Rawlings Co. LLC</u>, 854 F.3d 368, 384–85 (6th Cir. 2017) ("Interference occurs when an employer shortchanges an employee's leave time . . . ") (internal alterations and quotes omitted).

Based on the record, the Court concludes there is a triable issue of fact as to whether USS interfered with Plaintiff's FMLA leave. Plaintiff testified that when Solis called him, he was "made aware" that USS "needed [him] to get back to work." (Pl.'s Response to USS SUF ¶ 25.) Solis "made clear that [he] may not have [his] salaried position when [he] returned." (Mattison Decl. ¶ 4.) Plaintiff felt that if he didn't go back to work, his "job was probably going to be in jeopardy." (Pl.'s Response to USS SUF ¶ 25.) After that call, Plaintiff asked his clinician at the Behavioral Medicine Center to allow him to go back to work earlier because he was afraid that he may not have a job when he returned to work. (<u>Id.</u>) Plaintiff testified that at the time of the phone call he "was still in treatment" and he declares that he "would have benefitted from continuing [his] treatment." (<u>Id.</u>; Mattison Decl. ¶ 4.) Plaintiff testified that if Solis had not called him, he would have continued his FMLA leave through March 3, 2019. (<u>Id.</u>)

USS responds that Plaintiff failed to submit admissible evidence that Solis called him because Plaintiff submitted his cell phone records without proper foundation or authentication. (USS MSJ Reply at 2-3.) "Where documents are otherwise submitted to the court, and where personal knowledge is not relied upon to authenticate the document, the district court must consider alternative means of authentication under Federal Rules of Evidence 901(b)(4)."[10] <u>Las Vegas Sands, LLC v. Nehme</u>, 632 F.3d 526, 533 (9th Cir. 2011) (finding that district court abused its discretion by excluding a letter and return receipt on the sole ground that they were not authenticated by a witness with personal knowledge; the Ninth Circuit stated that the evidence could have been authenticated by review of their contents if they appeared to be sufficiently genuine). Here, the phone records are dated January 11, 2019 to February 10, 2019, they contain

---

[10] Federal Rule of Evidence 901(b)(4) provides that authentication sufficient for admissibility can be satisfied by the object's "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4).

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk <u>NP</u>

the Verizon logo at the top left of each page, and contain the date, time, number, origination, destination, and minutes for Plaintiff's "talk activity." (Fermaint Declaration 2, Exhibit E.) Those characteristics are sufficient to support a finding that Plaintiff received a phone call on February 8, 2019. USS argues that even if the Court considers Plaintiff's cell phone records and his deposition testimony, the evidence does not show that Solis "made" him cut his FMLA short by two weeks. (USS Reply at 3.) USS contends that because Plaintiff was cleared to return to work without restrictions by his clinician, Plaintiff did not utilize the entirety of his leave either by choice or on the recommendation of his physician, not because of Solis's phone call. (Id.)

At trial, the jury will determine whether USS's conduct—as described above and in light of Plaintiff's clinician's authorization to return to work—constituted interference under the FMLA. If Plaintiff's testimony is credited, a reasonable jury could find that Solis's phone call to Plaintiff "chill[ed]" his freedom to exercise his rights and pressured him to cut his leave short, which would constitute an interference with his right to take leave. Bachelder, 259 F.3d at 1123. Thus, the Court **DENIES** USS summary judgment as to Plaintiff's FMLA/CFRA interference claim based on Solis's phone call. For all the reasons discussed above, the Court also **DENIES** Plaintiff's motion for partial summary judgment on his FMLA/CFRA interference claim based on Solis's phone call.

### 2. Request to Work from Home and Email to Human Resources

Plaintiff argues that USS violated his FMLA rights by denying his request for a work-from-home day. (PMSJ at 8-9.) Plaintiff contends that when he asked Solis and Finegan-Redell whether he could work remotely from home a couple days a week and informed Human Resources about his request, USS should have offered Plaintiff the opportunity to take FMLA leave instead of rejecting his request. (Id. at 10.) USS argues that Plaintiff's request to work from home was not an accommodations request for leave. (PMSJ Opp'n at 14.)

"The Ninth Circuit has held that '[e]mployees need only notify their employers that they will be absent under circumstances which indicate that the FMLA might apply.'" dela Cruz v. DeJoy, 2022 WL 2668378, at *5 (N.D. Cal. July 11, 2022) (quoting Bachelder, 259 F.3d at 1130). "It is the employer's responsibility to determine when FMLA leave is appropriate, to inquire as to specific facts to make that determination, and to inform the employee of his or her entitlements." Xin Liu, 347 F.3d at 1134. An employee seeking FMLA leave "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. §§ 825.302(c), 825.303(b) (information that is sufficient "for an employer to reasonably determine whether the FMLA may apply to [a] leave request" may include "that a condition renders the employee unable to perform the functions of the job"). If the leave is foreseeable, the employee must "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). If the leave is unforeseeable, the employee must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(c).

It is undisputed that on the day that he returned to work, Plaintiff requested that he be allowed to work from home either a day or a couple of days during the week because this would help alleviate his panic attacks and anxiety.  (Pl.'s Response to USS SUF ¶ 28; PSUF to USS MSJ ¶ 9.)  Indeed, Solis testified that during the meeting, Plaintiff "expressed a desire to have voluntary telecommuting work set up through [the] normal remote day request process." (Response to PMSJ PSUF ¶ 9.)  It is also undisputed that Plaintiff did not ask for any time off, he did not indicate that he would be absent, and he did not state that he had a condition that rendered him unable to perform the functions of his job.  See Bachelder, 259 F.3d at 1130 (holding that employee that provided two doctor's notices regarding her absences placed the employer on notice that the leave might be covered by the FMLA).  And Plaintiff's clinician authorized him to return to work from his leave without any restrictions.  (USS SUF ¶ 24.) Thus, because Plaintiff did not notify his employer that he would be absent from work or would like to be absent, there is a triable issue of fact as to whether Plaintiff's request for a work from home accommodation constituted sufficient notice that he was requesting leave.

Furthermore, although Plaintiff argues that he notified Human Resources that he needed an accommodation, Plaintiff has provided no evidence to support his argument.  The only evidence Plaintiff provides is an email that he sent to Fry, an Employee Relations Assistant, where he discusses his meeting with Solis and Finegan-Redell.  (USS SUF ¶ 37.)  In the email, Plaintiff does not make any reference to an accommodation request.  (Id. ¶ 41.)  Plaintiff has also provided no evidence that he brought up any accommodation request when he spoke with Jang, a Human Resources Partner.  Accordingly, the Court **DENIES** summary judgment to Plaintiff as to his FMLA/CFRA interference claim based on USS's denial of his work-from-home request.[11]

### 3.  Plaintiff's Demotion

USS argues that it did not interfere with Plaintiff's medical leave because it reinstated Plaintiff in the same position he had prior to going on leave.  (USS MSJ at 11.)  Plaintiff argues that although he returned to the same position, USS interfered with his FMLA rights by forcing Plaintiff to demote about six weeks after his return to work.  (USS MSJ Opp'n at 7.)  USS responds that Plaintiff's demotion was a "voluntary demotion" because Plaintiff requested to return to his previous position.  (USS MSJ Reply at 3-4.)

"[E]vidence that an employer failed to reinstate an employee who was out on FMLA leave to her original (or an equivalent) position establishes a prima facie denial of the employee's FMLA rights."  Sanders, 657 F.3d at 778.  Plaintiff argues that Crawford is instructive here. (USS MSJ Opp'n at 7 (citing Crawford v. JP Morgan Chase & Co., 531 F. App'x 622, 626 (6th Cir. 2013)).  In Crawford, the defendant asserted that because plaintiff returned to the same position immediately after she returned from approved FMLA leave, it did not interfere with plaintiff's FMLA rights.  Crawford, 531 F. App'x at 626 ("Crawford").  The plaintiff argued that defendant interfered with her FMLA rights by transferring her to a non-equivalent position

---

[11] USS did not move for summary judgment as to Plaintiff's FMLA/CFRA interference claim based on its denial of his work-from-home request.

shortly after she returned from FMLA leave.  <u>Id.</u>  The court did not directly address the gap of time (about a month) that occurred between the plaintiff's return from leave and the transfer of plaintiff to a different position, but stated that "[i]f the positions [were] not equivalent, then [plaintiff] was denied a benefit to which she was entitled under FMLA" because "[a] denial of FMLA benefits is the equivalent of an adverse action and thus violates the FMLA."  <u>Id.</u> (finding that a reasonable fact-finder could determine that the position that defendant transferred plaintiff to shortly after she came back from leave was not equivalent; the court reversed the district court's grant of summary judgment in favor of defendant on plaintiff's FMLA interference claim); <u>see also</u> <u>Bachelder</u>, 259 F.3d at 1122 (FMLA's prohibition against an employer interfering with, restraining, or denying the exercise of or the attempt to exercise any right provided by the FMLA encompasses an employer's consideration of an employee's use of FMLA-covered leave in making adverse employment decisions).  Similarly, Plaintiff argues that USS forced Plaintiff to demote shortly after his return from his leave.  (USS MSJ Opp'n at 7.)

Unlike in <u>Crawford</u>, where the defendant transferred the plaintiff to a possibly inequivalent position, here, Plaintiff requested that he return to his prior position.  It is undisputed that on the day that Plaintiff returned to work, Plaintiff attended a meeting with Solis and Finegan-Redell where he was told that he could stay in his current position or go back to his previous role in instructional design, given the health issues that he had been having.  (USS SUF ¶ 53; Mattison Depo, 127:20-128:7.)  On April 2, 2019, about six weeks after Plaintiff returned to work, Plaintiff requested a demotion from IS Architect 2 to IT Instructional Designer.  (<u>Id.</u> ¶ 51.)  That day, Plaintiff emailed Solis stating, "After giving it much thought, I think it is best right now that I step away from the architect role go back to my role as a principal trainer, I am excited to grow in my career at Loma Linda, but I think taking this time to focus on my health is the best decision for the time being. Thank you."  (<u>Id.</u>)  It is also undisputed that Plaintiff testified that it "was ultimately [his] decision [to request the demotion], although there was a lot of pressure and coercion from the people that [he] reported to, to go back to it."  (<u>Id.</u> ¶ 52.)  Plaintiff declares that the pressure included the following: he was "forced to return early from FMLA leave, [he] was given an ultimatum to give up [his] salaried position, [he] was denied an accommodation . . . to work from home . . . [and] was forced to earn the accommodation," and Jang had told him that Finegan-Redell and Solis's actions "were not illegal."  (Mattison Decl. ¶¶ 7-8.)

"At the summary judgment phase, courts must view the inferences reasonably drawn from the record in the light most favorable to the nonmoving party," <u>Matsushita Elec.</u>, 475 U.S. at 587-88, and may not weigh the evidence.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . .").  Under this standard, there is a triable issue of fact as to whether USS interfered with Plaintiff's FMLA rights through his "voluntary" demotion.  A reasonable factfinder could conclude that Plaintiff was pressured or forced to go back to his previous position through Solis's phone call and through the "ultimatum" that he was given to either stay in his current position or go back to his previous role, given the health issues that he had been having.  (USS SUF ¶ 53; Mattison Decl. ¶¶ 7-8.)  Thus, Plaintiff's interference claim on the grounds that he was forced to demote himself survives summary judgment.  At trial, the jury will determine whether USS's conduct—as described

above, and in light of Plaintiff's testimony that it was ultimately his decision to return to his prior position—constituted interference under the FMLA. Accordingly, the Court **DENIES** summary judgment to USS as to Plaintiff's FMLA/CFRA interference claim based on Plaintiff's demotion. For all the reasons discussed above, the Court also **DENIES** Plaintiff's motion for partial summary judgment on his FMLA/CFRA interference claim based on his demotion.

### 4. Use of FMLA Leave as a Negative Factor in Plaintiff's Demotion and Termination

Under the FMLA, it is unlawful for an employer to "'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" Jadwin, 610 F. Supp. 2d at 1159 (quoting Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1122 (9th Cir.2001)). In his SAC, Plaintiff alleges that USS "retaliate[ed] against [him] for requesting and/or taking time off that was authorized by and protected under the FMLA" by taking "adverse personnel actions against him for using leave." (SAC ¶¶ 39-40, 46-47.) Because Plaintiff alleges that he suffered negative consequences as a result of taking medical leave under the FMLA, the Court construes his complaint as one for interference with the exercise of his rights under the FMLA, § 2615(a)(1). Bachelder, 259 F.3d at 1124-25.[12]

To prevail on a claim that an employer interfered with his rights by demoting or terminating him in violation of FMLA, Plaintiff must show "by a preponderance of the evidence that [his] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [him]" or demote him.[13] Id. at 1125. Thus, the question before the Court is whether there are triable issues of material fact as to whether USS impermissibly considered Plaintiff's utilization of FMLA leave as a factor in his demotion and termination.

---

[12] In Bachelder, the Ninth Circuit stated: "Bachelder's claim does not fall under the 'anti-retaliation' or 'antidiscrimination' provision of § 2615(a)(2), which prohibits 'discriminat[ion] against any individual for opposing any practice made unlawful by the subchapter' []; nor does it fall under the anti-retaliation or anti-discrimination provision of § 2615(b), which prohibits discrimination against any individual for instituting or participating in FMLA proceedings or inquiries. By their plain meaning, [those] provisions do not cover visiting negative consequences on an employee simply because he used FMLA leave. Such action is, instead, covered under §2515(a), the provision governing 'Interference [with the] Exercise of Rights.'"

[13] Because Plaintiff's FMLA "retaliation" claim is actually an interference claim, the McDonnell Douglas framework does not apply to Plaintiff's FMLA claim. See Sanders, 657 F.3d at 778 (The Ninth Circuit has "declined to apply the type of burden shifting framework recognized in McDonnell Douglas to FMLA 'interference' claims; rather, '[an employee] can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both.'") (quoting Bachelder, 259 F.3d at 1125). However, California courts do apply the McDonnell Douglas framework to a CFRA retaliation claim. Thus, the Court's analysis and conclusions in this section only concern Plaintiff's FMLA claim, not CFRA. Plaintiff's CFRA retaliation claim is discussed in Section V.C.

---

USS asserts that it did not consider Plaintiff's FMLA leave when it agreed to demote Plaintiff because Plaintiff made the ultimate decision to be demoted.  (USS MSJ Reply at 4.)  Considering the evidence in the light most favorable to Plaintiff, a reasonable jury may find that USS considered Plaintiff's FMLA leave when they "forcibly" demoted him.  For example, Plaintiff testified that Solis caused him to cut his leave short, Solis and Finegan-Redell had a meeting with Plaintiff the day he returned to work after his FMLA leave, and during that meeting they specifically pointed out the health issues he had been having when they asked him to decide whether he wanted to stay in his current role or go back to his prior one.  (Pl.'s Response to USS SUF ¶ 25; Mattison Decl. ¶ 4; PMSJ PSUF ¶ 26.)  Thus, the Court finds that there is a triable issue of material fact as to whether USS impermissibly considered Plaintiff's utilization of FMLA leave as a negative factor in "forcibly" demoting him.  Accordingly, the Court **DENIES** USS summary judgment as to Plaintiff's FMLA interference claim on the grounds that USS may have impermissibly considered Plaintiff's utilization of FMLA leave as a factor in his demotion.

As to Plaintiff's termination, USS asserts that it terminated Plaintiff because of his "unethical conduct of timecard fraud," not because of his FMLA leave.  (USS MSJ at 13.)  Plaintiff argues that because Cook found out that Plaintiff requested a remote workday—an accommodation that Plaintiff argues is related to his FMLA leave—and then fired him four weeks later, he presents triable issues.  (USS MSJ Opp'n at 9.)  The Court is unpersuaded by Plaintiff's argument.  Even if Plaintiff's remote workday accommodation request was related to his FMLA leave, Plaintiff does not explain how Cook finding out about his request, especially in light of the fact that Plaintiff had requested a remote workday not only after he came back from leave but also prior to taking leave, shows that his FMLA leave constituted a negative factor in USS's decision to terminate him.  (USS SUF ¶ 33.)  Without more, the Court is unable to find that Plaintiff has presented evidence to create a triable issue as to whether USS impermissibly considered Plaintiff's FMLA leave as a factor in its decision to terminate him six months later for timecard fraud.  Accordingly, the Court **GRANTS** USS summary judgment as to Plaintiff's FMLA interference claim on the basis that it impermissibly considered Plaintiff's utilization of FMLA leave as a factor in his termination.

## C. Claim Two: CFRA Retaliation

Plaintiff alleges that he "was retaliated against after requesting and/or taking protected leave" under CFRA.  (Id. ¶¶ 46, 48.)  USS moves for summary judgment on Plaintiff's retaliation claim by arguing that Plaintiff cannot establish a prima facie case that his demotion or termination was due to his taking of leave.  (USS MSJ at 13; USS Reply at 4.)  USS contends that even if Plaintiff establishes a prima facie case, USS has articulated a legitimate, non-retaliatory reason for terminating Plaintiff, and he has no evidence to show that USS's reason is a pretext.  (USS MSJ at 14.)

### 1. Demotion

The elements of a cause of action for retaliation in violation of CFRA are: "'(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take

CFRA leave; (3) the plaintiff exercised her right to take [leave] for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA [leave].'" Moore, 248 Cal. App. 4th at 248.  The McDonnell Douglas burden shifting analysis applies to retaliation claims under CFRA. Id.  Under the test, once an employee "establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action.  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation drops out of the picture, and the burden shifts back to the employee to prove intentional retaliation."  Faust v. California Portland Cement Co., 150 Cal. App. 4th 864, 885 (2007) (internal quotes omitted).

USS argues that Plaintiff's demotion was not an adverse action because he chose to demote himself.  (USS Reply at 4.)  Although it is undisputed that Plaintiff requested the demotion, (USS SUF ¶ 51), Plaintiff also presented evidence that he felt pressured and coerced to demote himself because USS cut his leave short, denied his request to work from home, and asked him to decide whether he would demote himself given his health issues.  (Mattison Decl. ¶¶ 7-8.)  Construing this evidence in the light most favorable to Plaintiff, the Court finds a triable issue on whether his demotion was an adverse employment action due to his taking of leave.  Because the Court finds that Plaintiff makes a showing of a prima facie case, a presumption of retaliation arises.  Faust, 150 Cal. App. 4th at 885.  USS must rebut the presumption by producing evidence that its action was taken for a legitimate, nonretaliatory reason.  Id.

USS argues that its action in agreeing to demote Plaintiff was based on Plaintiff's email where he requested that he return to his prior position to focus on his health.  (USS Reply at 4.) Given that there are triable issues of material fact as to whether Plaintiff was forced to demote, the Court is unable to find that USS has met its burden to provide a legitimate, nondiscriminatory reason for demoting him.  And even if the Court found that USS has met its burden, the Court finds that Plaintiff raises triable issues of fact regarding pretext.  A reasonable jury could find that USS's stated reason for demoting Plaintiff was pretextual by finding that USS intentionally retaliated against him because it cut his leave short, denied his request to work from home, and on the day that he returned to work from his leave he was asked to decide whether he wanted to stay in his current position or go back to his prior one.  Accordingly, the Court **DENIES** USS summary judgment as to Plaintiff's CFRA retaliation claim based on his demotion.

### 2. Termination

As to Plaintiff's termination, USS asserts that it terminated Plaintiff because of his "unethical conduct of timecard fraud."  (USS MSJ at 13.)  Plaintiff argues that because Cook found out that Plaintiff requested a remote workday and then fired him four weeks later, he presents triable issues.  (USS MSJ Opp'n at 9.)  But Plaintiff does not explain how Cook's knowledge of Plaintiff's request demonstrates that his termination was due to the exercise of his right to take leave.  See Moore, 248 Cal. App. 4th at 248 (the plaintiff must have suffered an adverse employment action, such as termination, because he exercised his right to take CFRA

leave).  Thus, the Court rejects Plaintiff's argument for the same reasons stated above.  (See supra Section V.B.4.)  Accordingly, the Court finds that Plaintiff has not presented evidence that creates a triable issue as to whether his termination was a result of his taking of leave.  The Court **GRANTS** USS summary judgment as to Plaintiff's CFRA retaliation claim on the basis that USS retaliated against him by terminating him.

## D.  Claim Five and Six: Retaliation under the ADAAA and FEHA

Plaintiff alleges that USS discriminated against him because he exercised his rights under the ADAAA and FEHA by notifying USS "of his need for a work accommodation related to his disability" and he "was the victim of retaliation thereafter."  (SAC ¶¶ 55, 85.)  USS moves for summary judgment on Plaintiff's ADAAA and FEHA claims arguing that Plaintiff cannot establish that USS retaliated against him for requesting a work-from-home accommodation.  (USS MSJ at 3, 13.)

Under FEHA, an employer may not discriminate against any person because "the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov't Code § 12940(h).  Under both the ADA and ADAAA (collectively, "ADA"), an employer may not take adverse action against an individual who "has opposed any act or practice" the ADA makes unlawful.  42 U.S.C. § 12203(a).  For a FEHA and ADA retaliation claim, a plaintiff must first make out a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two."  Brown v. City of Tucson, 336 F.3d 1181, 1186 (9th Cir. 2003).  For an ADA retaliation claim, the "standard for the causal link is but-for causation."  T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist., 806 F.3d 451, 473 (9th Cir. 2015) (internal quotes omitted).  Under FEHA, a plaintiff must only demonstrate that the protected conduct was a "substantial motivating factor" in the adverse employment decision.  Alamo v. Prac. Mgmt. Info. Corp., 219 Cal. App. 4th 466, 478 (2013).

After the plaintiff makes a prima facie case, the Ninth Circuit applies the McDonnell Douglas burden shifting analysis to ADA and FEHA retaliation claims.  Brown, 336 F.3d at 1186; see Chisolm v. 7-Eleven, Inc., 383 F. Supp. 3d 1032, 1066 (S.D. Cal. 2019), aff'd, 814 F. App'x 194 (9th Cir. 2020).  In other words, once the plaintiff establishes a prima facie case, the employer has the burden to "present legitimate reasons for the adverse employment action."  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir.2000).  "If the employer carries this burden, and plaintiff demonstrates a genuine issue of material fact as to whether the reason advanced by the employer was a pretext, then the retaliation case proceeds beyond the summary judgment stage."  Id.

Plaintiff presented evidence showing the first two elements of a prima facie case.  Plaintiff engaged in a protected activity when he requested that he be allowed to work from home (Pl.'s Response to USS SUF ¶ 28).  See Coons v. Sec'y of U.S. Dep't of Treasury, 383 F.3d 879, 887 (9th Cir. 2004) (finding that plaintiff engaged in a protected activity under the ADA when he requested that the IRS make reasonable accommodations for his alleged disability); see Cal.

Gov't Code § 12940(m)(2) (Under FEHA, it is an unlawful employment practice for an employer to "retaliate or otherwise discriminate against a person for requesting accommodation"). Plaintiff suffered an adverse employment action when he was terminated. See Cal. Gov't Code § 12940(h) (it is unlawful for employer to "discharge, expel or otherwise discriminate"); Howell v. STRM LLC - Garden of Eden, 2020 WL 5816582, at *6 (N.D. Cal. Sept. 30, 2020) (termination is an adverse employment action for the purpose of an ADA retaliation claim).

Plaintiff argues the temporal proximity of his request and his termination is sufficient evidence to show a causal link. (USS MSJ Opp'n at 14.) On February 19, 2019, Plaintiff made his request to work from home and his request was denied. (USS SUF ¶ 26; Pl.'s Response to USS SUF ¶ 28.) On July 26, 2019, five months after Plaintiff made his request, Solis informed Cook, the newly installed executive director in Plaintiff's department, that Plaintiff had previously asked for a remote workday. (PSUF to USS MSJ ¶ 34; USS SUF ¶ 56.) In mid-August 2019, Cook informed Plaintiff that she was reporting him to HR to conduct an investigation against him for timecard fraud. (Mattison Decl. ¶ 11.) On August 27, 2019, four weeks after Cook found out about Plaintiff's request, Plaintiff was terminated. (USS SUF ¶ 72.) The Court finds this evidence sufficient to make a prima facie showing of causation under FEHA because Plaintiff suffered an adverse employment action four weeks after Cook found out about Plaintiff's request to work from home. Light v. Dep't of Parks & Recreation, 14 Cal. App. 5th 75, 94 (2017) (a temporal relationship between an employee's protected activity and the adverse employment action is sufficient for a plaintiff's prima facie case).

The "but for" causation requirement in ADA retaliation claims is more stringent because it requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action of the employer. Brooks v. Capistrano Unified Sch. Dist., 1 F. Supp. 3d 1029, 1037 (C.D. Cal. 2014) (finding that teacher failed to establish a causal connection, under either the "but-for" or lesser "motivating factor" standard between her protected activity and non-renewal of her employment contract because the school district had received a litany of reports about the teacher's misconduct and the district's board of trustees was unaware of teacher's protected activity when it chose not to renew her contract). Here, the temporal proximity between Plaintiff's request for accommodation with evidence that his timecard "fraud" was approved by supervisor, as discussed in more detail below, provides sufficient circumstantial evidence to establish a causal link.

By establishing a prima facie case of retaliation, Plaintiff shifts the burden to USS to show a legitimate, nonretaliatory reason for terminating him. USS has met that burden by providing evidence that it terminated Plaintiff due to timecard fraud. (USS SUF ¶ 72.) In August 2019, on multiple occasions, Solis and Cook noticed that Plaintiff was clocking into USS's API system around 8:30 a.m., but he was not showing up to his office until around 9:00 a.m. (Id. ¶¶ 62-66.) When Cook asked him about the discrepancy between his clock-in time and the time that Plaintiff arrives at his office, Plaintiff admitted that he clocks in to work remotely while he is at home before beginning his commute to work. (Id. ¶¶ 67-69.) Shortly after, Plaintiff was terminated for

timecard fraud.  (<u>Id.</u> ¶ 72.)  Thus, the burden shifts to Plaintiff to raise triable issues of fact regarding pretext.  <u>Brooks</u>, 229 F.3d at 928.

Plaintiff argues that USS's reasoning is a pretext because he was not given a final warning before being terminated and his actions were condoned by his supervisor.  (PSUF to USS MSJ ¶ 34.)  Because it is USS's policy to give a final warning to an employee for time-card falsification, (USS MSJ Opp'n at 15), USS failure to follow its own policy provides evidence that USS's nondiscriminatory reasons for adverse employment action may have been pretextual.  <u>Moore</u>, 248 Cal. App. 4th at 239 ("A defendant's failure to follow its own policies or procedures may also provide evidence of pretext.").  Plaintiff also testified that Solis told him and other employees that when employees visit an off-site location "or those times when its hectic," they can clock in from home and then drive to where they need to go.  (USS MSJ Opp'n at 4; Pl.'s Response to USS SUF ¶ 61.)  Plaintiff declares that he understood that his actions of logging into his computer from home to check his email, calendar, prepare for the day, and then commute for five minutes to get to his office, was an action that was allowed based on his conversations with Solis.  (Mattison Decl. ¶ 10.)  On the other hand, Solis testified that USS has a policy that employees must log out when they commute, and that Plaintiff was aware of that policy.  (Pl.'s Response to USS SUF ¶ 61.)

Given that Plaintiff's termination occurred after his request for accommodation, that USS did not follow its policy of providing a final warning before terminating Plaintiff, and that Plaintiff's supervisor may have approved of Plaintiff's action of clocking in before work and then commuting to the office, the Court finds a triable issue of fact as to whether USS's reasoning for termination is a pretext.[14]  Accordingly, the Court **DENIES** USS summary judgment as to Plaintiff's ADAAA and FEHA retaliation claims.

## E.  Claims Three, and Four: Disability Discrimination Under the ADA and FEHA

Plaintiff alleges that USS discriminated against him because "of his actual or perceived disability" and because he notified USS "of his need for a work accommodation related to his disability."  (SAC ¶¶ 54-55, 63-67.)  USS moves for summary judgment on Plaintiff's ADAAA and FEHA claims arguing that Plaintiff cannot establish that USS discriminated against him for

---

[14] The Court notes that Plaintiff also attempts to establish pretext by offering "evidence of a comparator."  (USS MSJ Opp'n at 14.)  Plaintiff argues that another USS employee, Megan Pyo ("Pyo"), and Plaintiff were in "symbiotic jobs," they reported to the same chain of supervisors, they were both subject to the timecard fraud policy, and were both "paid for activities" that USS does not allow, but Pyo, a non-disabled individual, was not fired for her violation.  (<u>Id.</u> at 14-15.)  Plaintiff contends that this difference in treatment establishes that USS's reason for termination is a pretext.  (<u>Id.</u>)  The Court is unpersuaded.  After reviewing the record, the Court finds that Pyo's violation was different than that of Plaintiff's.  Pyo created a social media post while she was at the office; Pyo was not clocking in from home and then commuting to work.  (USS MSJ Reply at 8-9.)  Accordingly, the Court finds that Plaintiff's comparator evidence does not establish pretext.

---

failing to accommodate him, for demoting him, or for terminating him because of his disability. (USS MSJ at 2-3, 16; USS MSJ Reply at 5-6.)

### 1. Accommodation

Plaintiff contends that USS violated the ADA and FEHA by failing to reasonably accommodate his request to work from home. (USS MSJ Opp'n at 11.) USS contends that Plaintiff's request to work from home is not an accommodation related to his disability, but instead it was a request to be part of his department's practice that allowed remote workdays for some employees. (USS MSJ at 19-20.)

Under the ADA, the term "discriminate" is defined as including "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001). Similarly, under FEHA, it is an unlawful employment practice for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n). "The interactive process required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively." Scotch v. Art Inst. of California, 173 Cal. App. 4th 986, 1013 (2009) (internal quotes omitted).

It is undisputed that on February 19, 2019, Finegan-Redell asked Plaintiff if there were any "accommodations" that he needed. (Pl.'s Response to USS SUF ¶ 28.) Plaintiff requested that he be able to work from home either a day or a couple of days during the week. (Id.) Plaintiff stated that the work from home program " would be really beneficial" because it "would accommodate . . . what [he was] experiencing as far as panic attacks and . . . the anxiety" he had. (PSUF to USS MSJ ¶ 9.) Working from home "would give [him] that moment of pause that's necessary at times" and it would "be tremendously helpful" because he wouldn't "have distractions and things popping up where [he] can readjust to what's going on." (Id. ¶ 21.) Finegan-Redell responded that there were "certain things" that they wanted to see change about Plaintiff's work before they'd be willing to grant him a work-from-home day and that they would talk about what those changes were over the coming weeks. (Pl.'s Response to USS SUF ¶ 28.) Finegan-Redell did not grant Plaintiff's request to work from home. (Id.)

When Plaintiff informed Finegan-Redell and Solis of his request to work from home, USS could have "either granted it or initiated discussions with [Plaintiff] regarding other alternatives." Humphrey, 239 F.3d at 1139. Indeed, working from home "is a reasonable

accommodation when the essential functions of the position can be performed at home and a work-at-home arrangement would not cause an undue hardship for the employer." Id. at n.16. Instead Finegan-Redell "denied Plaintiff's request without suggesting any alternative solutions or exploring with [him] the possibility of other accommodations." Id. at 1139. USS's contention that Plaintiff had previously requested to work from home in 2018, was cleared by his physician to return from work, and that Plaintiff did not submit any documentation to support his need for a work from home accommodation misses the mark. (USS Reply at 7-8.) Once Plaintiff informed USS that working from home would accommodate his panic attacks and anxiety, his employer had the "mandatory obligation" to "engage in an interactive process with [Plaintiff] to identify and implement appropriate reasonable accommodations." Humphrey, 239 F.3d at 1137. Given that USS has provided no evidence that it engaged in the interactive process, the Court **DENIES** USS summary judgment as to Plaintiff's accommodation request under the ADA and FEHA. See Snapp v. United Transportation Union, 889 F.3d 1088, 1097 (9th Cir. 2018) (an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process).

### 2. Demotion

USS moves for summary judgment on Plaintiff's ADA and FEHA claims arguing that Plaintiff cannot establish that USS discriminated against him by demoting him because of his disability. (USS MSJ at 2-3, 16; USS MSJ Reply at 5-6.) FEHA prohibits employment discrimination on the basis of protected characteristics, including physical or mental disability. Cal. Gov't Code § 12940(a). "The elements of a disparate treatment disability discrimination claim are that the plaintiff (1) suffered from a disability or was regarded as suffering from a disability, (2) could perform the essential duties of a job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability." Zamora v. Sec. Indus. Specialists, Inc., 71 Cal. App. 5th 1, 31 (2021). The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112. Like FEHA, under the ADA, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) plaintiff suffered an adverse employment action because of his disability. Cooper v. Dignity Health, 438 F. Supp. 3d 1002, 1008 (D. Ariz. 2020), aff'd, 2021 WL 3667225 (9th Cir. Aug. 18, 2021).

After the plaintiff makes a prima facie case, the Ninth Circuit and California apply the McDonnell Douglas burden shifting analysis to ADA and FEHA disability discrimination claims. See London v. Sears, Roebuck & Co., 619 F. Supp. 2d 854, 860 (N.D. Cal. 2009), aff'd, 458 F. App'x 649 (9th Cir. 2011) (The McDonnell Douglas framework applies to FEHA discrimination claims); Curley v. City of N. Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014) (The McDonnell Douglas framework applies to ADA discrimination claims). Like the ADA and FEHA retaliation claims analyzed above, disability discrimination claims also have different standards of causation. Under an ADA discrimination claim, Plaintiff "must show that the adverse employment action would not have occurred but for the disability." Murray v. Mayo Clinic, 934 F.3d 1101, 1105 (9th Cir. 2019). Under a FEHA discrimination claim, the disability must have been "a substantial

motivating factor" for the employment decision.  <u>Harris v. City of Santa Monica</u>, 56 Cal. 4th 203, 214 (2013).

USS does not dispute that Plaintiff suffers from a disability or that he was able to perform the essential functions of his job with or without accommodations.  (USS MSJ at 16-17.)  USS only disputes the third element—that Plaintiff was subjected to an adverse employment action due to his disability.  (<u>Id.</u>)

### a.  Prima Facie Case

USS argues that Plaintiff cannot establish that his demotion was an adverse employment action because Plaintiff requested it.  (USS MSJ Reply at 6-7.)  For similar reasons that the Court stated above, whether Plaintiff's demotion was an adverse employment action is a triable issue of fact.  (<u>See</u> <u>supra</u> Section V.B.3.)  Specifically, a reasonable factfinder could conclude that Plaintiff was pressured or forced to demote through Solis's phone call which caused him to cut his leave, the denial of his request to work from accommodation, and through the "ultimatum" that he was given to either stay in his current position or go back to his previous role, given the health issues that he had been having.  (USS SUF ¶ 53; Mattison Decl. ¶¶ 7-8.)

Next, USS argues that Plaintiff cannot meet the ADA or FEHA causation standard that Plaintiff's demotion would not have occurred but for his disability or that his disability was a motivating factor for his demotion.  (USS MSJ Reply at 6-7.)  USS contends that Plaintiff has not produced any evidence that USS would not have agreed to demote Plaintiff because he was already having performance issues prior to his leave.  (USS MSJ Reply at 6-7.)  Indeed, although Plaintiff argues that he was a stellar employee, the record establishes otherwise.  Prior to taking leave, Plaintiff had several discussions with Finegan-Redell about his performance and attendance.  (USS SUF ¶ 10.)  He was asking for a level of "oversight and guidance" that was higher than what someone in his position should expect, he was not completing an 8.5 hour workday, and he was not available to others during business hours.  (<u>Id.</u> ¶¶ 11-12, 14.)  But the evidence is not one-sided.  During the time that Plaintiff had performance and attendance issues, he was "dealing with the medical condition" that he later "had to go on leave for."  (USS SUF ¶ 37.)  Furthermore, even if Plaintiff continued to have performance issues after he came back from leave, this may have been due to Plaintiff's leave being cut short, that he was denied his accommodation to work from home, and that he was asked to demote himself.  Thus, Plaintiff's evidence is enough to raise a causal inference between his disability and his "forced" demotion.  Accordingly, Plaintiff has established a prima facie case under FEHA and ADA.

### b.  Non-discriminatory Reason

To demonstrate a legitimate, nondiscriminatory reason for its decision to demote, USS "must show that the procedure by which [Plaintiff] was [demoted] was validly and fairly devised and administered to serve a legitimate business purpose." <u>Lucent Techs., Inc.</u>, 642 F.3d at 746–47 (quoting <u>Hanson v. Lucky Stores, Inc.</u>, 74 Cal. App. 4th 215, 224 (1999)).  "[L]egitimate reasons are reasons that are facially unrelated to prohibited bias, and which, if true, would thus

preclude a finding of discrimination." Reeves v. MV Transp., Inc., 186 Cal. App. 4th 666, 673 (2010) (internal quotations omitted). If the employee meets this burden, "the employee must then 'offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.'" Id. (quoting Hersant v. Department of Social Services, 57 Cal. App. 4th 997, 1004-05 (1997)).

USS again asserts that it demoted Plaintiff because Plaintiff requested to be demoted to take care of his health. (USS MSJ Reply at 6.) Given that there are triable issues of fact as to whether Plaintiff was forced to demote, the Court is unable to find that USS has met its burden to provide a legitimate, nondiscriminatory reason for demoting him. And even if the Court found that it has, Plaintiff has presented sufficient evidence to show that its reason may be a pretext given the circumstances surrounding the demotion. Accordingly, the Court **DENIES** USS summary judgment as to Plaintiff's FEHA and ADA discrimination claim as to his demotion.

### 2. Termination

USS argues that Plaintiff's disability discrimination claim as to his termination falls short for the same reasons as his retaliation claim under ADA and FEHA. (USS MSJ at 17-19.) Specifically, it argues that it terminated Plaintiff due to his timecard fraud, not his disability, and that Plaintiff has no such evidence to show that USS's proffered reason for termination is pretextual. (Id.) The Court rejects this argument for the same reasons stated above. (See supra Section V.D.) Specifically, given that Plaintiff's termination occurred after his request for accommodation, that USS did not follow its policy of providing a final warning before terminating Plaintiff, and Plaintiff's supervisor may have approved of Plaintiff's actions of clocking in before work and then commuting to the office, the Court finds a triable issue of fact as to whether USS's reasoning for termination is a pretext. Accordingly, the Court **DENIES** USS summary judgment as to Plaintiff's disability discrimination claim in violation of ADA and FEHA as it relates to his termination.

### F. Claims Seven and Eight: Hostile Work Environment Under the ADA and FEHA

USS moves for summary judgment on Plaintiff's hostile work environment under the ADA and FEHA. (USS MSJ at 20-25.) USS argues that Plaintiff failed to exhaust his administrative remedies and even if the Court found otherwise, Plaintiff has no evidence that he was harassed, that any harassment was based on his disability, or that the harassment was severe and pervasive. (Id.)

### 1. Exhaustion of Administrative Remedies

To "establish federal subject matter jurisdiction for an employment discrimination claim based on the ADA or Title VII, plaintiff must file an administrative charge with the EEOC or other appropriate state agency, such as DFEH, before commencing an action." Abdul-Haqq v.

Kaiser Emergency in San Leandro, 2017 WL 1549480, at *6 (N.D. Cal. May 1, 2017) (citing 42 U.S.C. § 2000e-5(f)(1)). "Allegations of discrimination not included in the plaintiff's administrative charge 'may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge.'" B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1100 (9th Cir. 2002), as amended (Feb. 20, 2002) (quoting Green v. Los Angeles County Superintendent of Schs., 883 F.2d 1472, 1475–76 (9th Cir. 1989)). Similarly, "under FEHA, employees must exhaust their administrative remedies by filing a complaint with DFEH within one year of the alleged unlawful employment action, and obtain a notice of right to sue." Abdul-Haqq, 2017 WL 1549480, at *6. The scope of the written administrative charge "defines the permissible scope of the subsequent civil action." Rodriguez v. Airborne Express, 265 F.3d 890, 897 (9th Cir. 2001).

"In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred." B.K.B., 276 F.3d at 1100. "A hostile work environment claim is composed of a series of separate but related acts that collectively constitute one unlawful employment practice." Leland v. City & Cnty. of San Francisco, 576 F. Supp. 2d 1079, 1091 (N.D. Cal. 2008).

Here, in his EEOC charge, Plaintiff states that he was discriminated against because of his disability in violation of the ADA and that his rights were interfered under the FMLA. (USS SUF ¶¶ 73-74.) Plaintiff explains the following in his EEOC: in February 2019, when he came back from medical leave, he was called into a meeting with Solis and Finegan-Redell and pressured to take a demotion; when asked what accommodations he needed, Plaintiff requested a remote work day but was denied the request; in August 2019, Solis told him that he was allowed to clock in from home but later that month Cook told him that he was under investigation for timecard fraud; in late August 2019, Plaintiff was told that he was going to be terminated due to timecard fraud. (Id.)

Although Plaintiff does not explicitly state that he brings hostile work environment claims in the EEOC charge, because the acts that he contends as discriminatory in his EEOC charge are the same acts that he claims constitute a hostile work environment, the dates of the alleged acts are the same, and the alleged perpetrators of the hostility are the same, the Court finds that his hostile work environment claims are "like or reasonably related" to the allegations contained in the EEOC charge. B.K.B., 276 F.3d at 1100. Accordingly, the Court has subject matter jurisdiction over Plaintiff's hostile work environment claims because he exhausted his administrative remedies.

### 2. Hostile Work Environment

Plaintiff asserts that he was subjected to a hostile work environment because he was forced to cut his medical leave short, he was refused an accommodation, Human Resources did nothing to assist him when he informed them that he had been told to decide whether he should

demote himself, he underwent a "farce" investigation of timecard fraud, and he was terminated. (USS MSJ Opp'n at 15.)

FEHA prohibits harassment of an employee. Cal. Gov't Code § 12940(j)(1). "To establish a claim for harassment, a plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she was subjected to harassment because she belonged to this group; and (3) the alleged harassment was so severe that it created a hostile work environment." Lawler v. Montblanc N. Am., LLC, 704 F.3d 1235, 1244 (9th Cir. 2013). The plaintiff must show a "concerted pattern of harassment of a repeated, routine or a generalized nature." Aguilar v. Avis Rent A Car Sys., Inc., 21 Cal.4th 121 (1999). Unlike discrimination claims, harassment "consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management." Id. For example, "commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, [and] the provision of support . . . do not come within the meaning of harassment." Reno v. Baird, 18 Cal. 4th 640, 646 (1998). "These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment." Id.

The Ninth Circuit has not decided whether a claim may be asserted under the ADA based on an alleged hostile work environment created by disability harassment. McIntyre v. Eugene Sch. Dist. 4J, 976 F.3d 902, 916 (9th Cir. 2020) (stating that although the Ninth Circuit has not resolved the issue, "every circuit to have done so has concluded that disability-based claims for hostile work environment are actionable under the ADA"). "[N]umerous courts in the Ninth Circuit have followed other circuits, though they assume rather than hold that such a claim is cognizable." Green v. City & Cnty. of San Francisco, 2021 WL 3810243, at *48 (N.D. Cal. Aug. 26, 2021) (citing Meirhofer v. Smith's Food & Drug Ctrs. Inc., 415 F.Appx. 806, 807 (9th Cir. 2011) (unpublished decision in which Ninth Circuit "assum[ed], arguendo, that hostile work environment claims are cognizable under the ADA")).

Assuming for the purposes of USS's MSJ that the Ninth Circuit would recognize a hostile work environment claim under the ADA, "Plaintiff would have to demonstrate that (1) [he] is a qualified individual with a disability; (2) [he] suffered from unwelcome harassment; (3) the harassment was based on [his] disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment; and (5) [d]efendants knew or should have known of the harassment and failed to take prompt remedial action." Wynes v. Kaiser Permanente Hosps., 936 F. Supp. 2d 1171, 1185 (E.D. Cal. 2013).

The record before the Court lacks evidence that USS harassed Plaintiff either because of his disability or accommodation request. The type of acts that Plaintiff describes such as being forced to cut his leave short, being refused an accommodation, demoting himself, undergoing an investigation for timecard fraud, and being fired are akin to "personnel management actions," Reno, 18 Cal. 4th at 646, that may be found to be discriminatory, but do not rise to the level of "severe and pervasive" harassment that would be actionable under the ADA or that is actionable

under FEHA.  <u>Wynes</u>, 936 F. Supp. 2d at 1185; <u>see</u> <u>Leland v. City & Cnty. of San Francisco</u>, 576 F. Supp. 2d 1079, 1102 (N.D. Cal. 2008) (finding that employer's failure to promote, negative criticism, performance evaluation, and transfer of employee was insufficient to form a basis for plaintiff's hostile work environment claim); <u>Velente-Hook v. E. Plumas Health Care</u>, 368 F. Supp. 2d 1084 (E.D. Cal. 2005) (finding that hospital personnel's alleged actions of telling nurse she would be fired if she could not return to work due to her medical condition, forcing her to return to work under duress so as to cause her health to deteriorate, refusing to release her paycheck unless she discussed a fitness-for-duty test, and stating in a letter that she was a "dangerous" nurse, fell within the scope of job duties of the type necessary for personnel management and were not actionable); <u>cf.</u> <u>Caldera v. Dep't of Corr. & Rehab.</u>, 25 Cal. App. 5th 31, 40 (2018) (finding that a jury could reasonably find that the harassing conduct was severe because it consisted of a prison's employees mocking or mimicking a correctional officer's stutter at least a dozen times and his supervisor's participation in the mocking and mimicking). Accordingly, the Court **GRANTS** USS summary judgment as to Plaintiff's hostile work environment claim under the ADA and FEHA.

## VI.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the PMSJ, **GRANTS** the UMC MSJ, and **GRANTS-IN-PART AND DENIES-IN-PART** the USS MSJ.  UMC is **DISMISSED**.

**IT IS SO ORDERED.**